[No. H006084. Sixth Dist. Mar. 18, 1991.]

Adoption of KAY C., a Minor.
CHRISTOPHER C. et al., Petitioners and Respondents, v.
KAY C., Objector and Appellant;
DEPARTMENT OF SOCIAL SERVICES, Real Party in Interest and
Respondent.

**COUNSEL**

Leo Himmelsbach, District Attorney, Penelope Blake and Kenneth Rosenblatt, Deputy District Attorneys, for Objector and Appellant.

Marer, Marer & Schuck, Gerald Z. Marer, Alan G. Marer, John F. Schuck III and Lynne R. Snyder for Petitioners and Respondents.

No appearance for Real Party in Interest and Respondent.

**OPINION**

**AGLIANO, P. J.**—Civil Code section 227b authorizes the superior court to set aside a decree of adoption within five years of its entry where the adopted child manifests a developmental disability or mental illness as a result of conditions which existed prior to the adoption and of which the adoptive parents had neither knowledge nor notice. The disability or illness must also be of such nature that the child is considered unadoptable.[1] Kay C., a 15-year-old minor, appeals from an order setting aside her adoption by respondents Christopher and Patricia C. She contends Civil Code section 227b[2] is unconstitutional as violative of due process and equal protection.

---

[1] Civil Code section 227b provides in relevant part: "If any child heretofore or hereafter adopted under the foregoing provisions of this code shows evidence of a developmental disability or mental illness as a result of conditions prior to the adoption to such an extent that the child cannot be relinquished to an adoption agency on the grounds that the child is considered unadoptable, and of which conditions the adopting parents or parent had no knowledge or notice prior to the entry of the decree of adoption, a petition setting forth such facts may be filed by the adopting parents or parent with the court which granted the petition for adoption. If such facts are proved to the satisfaction of the court, it may make an order setting aside the decree of adoption. [¶] The petition must be filed within whichever is the later of the following time limits: (a) within five years after the entering of the decree of adoption, or (b) within one year after the effective date hereof, if such a condition were manifest in the child within five years after the entering of the decree of adoption . . . ."

[2] All further statutory references are to the Civil Code unless otherwise noted.

For the reasons cited, we conclude section 227b violates neither the due process nor the equal protection clauses of the state and federal Constitutions and affirm the order.

## Factual Background

We recite the facts to provide a backdrop to the constitutional issues. In 1981, appellant, then six years old, was placed in a foster home due to the inability of her natural parents to care for her. On December 14, 1983, her natural parents relinquished their parental rights.

In 1984, the Department of Social Services recommended that appellant be placed for adoption. Dr. Henry Massie, who was appointed by the court to conduct an independent evaluation, recommended that appellant remain with her foster parents with whom she had a secure relationship. Appellant asked to remain with her foster parents. Dr. Albert DeRanieri, appellant's therapist, disagreed, stating she was ready for adoption. The Children's Home Society of California, an organization licensed by the State of California to place children in homes for adoption, placed her in respondents' home on October 13, 1984.

Respondents anticipated the child might experience difficulty in adjusting to a new environment and that she might require therapy. They were not willing, however, to adopt a child with severe emotional problems, specifically a psychotic or violent child. Respondents requested all available information about appellant, but they were not given Dr. Massie's report. Nor did the social worker inform respondents of her doubts that the adoption would be successful.

In February 1985, appellant began therapy with Paula Jacobsen, a licensed clinical social worker, because appellant was engaging in disruptive behavior. Jacobsen diagnosed appellant as a child with borderline personality disorder whose psychological defenses were projection, denial, and splitting. She concluded that appellant was able to respond to reasonable and appropriate guidance from respondents, but, characteristic of the borderline disorder, her behavior would be cyclical. Respondents were not specifically informed of appellant's disorder prior to the adoption. On November 14, 1985, the court issued the decree of adoption.

Following the adoption, appellant's cyclical behavior continued. However, her disruptive conduct became more pronounced; she became increasingly violent and destructive. After one such incident in March 1986, appellant accused Mr. C. of child abuse and threatened to call the police. When Mrs. C. attempted to stop her, appellant accused her of choking her and ran

from the home. Later, the police informed respondents that appellant had accused them of abusing her. Appellant was placed at a children's shelter, but when she became more hysterical and disoriented, she was transferred to Monte Villa Hospital for psychiatric evaluation.

The psychiatric admission evaluation, dated April 2, 1987, stated appellant "was clearly psychotic and exhibited a lot of paranoid/delusional thinking and some thought disorder features." About a week later, a psychological evaluation was completed. The report stated "[t]he most conservative diagnosis was an atypical psychosis with paranoid features. Her inability to deal with lack of structure suggests an incipient borderline personality."

In June 1987, appellant was transferred to Palomares Group Home, a residential placement for emotionally disturbed children. Between March and September 1987, respondents participated in family therapy and made efforts at reunification. However, their efforts failed. On July 15, 1988, respondents filed a petition to set aside the adoption.

Appellant remained at Palomares Group Home until January 31, 1989. She was subsequently admitted twice for psychiatric hospitalizations at Ross General Hospital. The diagnoses were schizophreniform disorder, chronic undifferentiated schizophrenia, major depression, and schizo-affective disorder, depressive type.

The trial court found under section 227b that: (1) appellant had a serious mental illness resulting from conditions existing prior to her adoption; (2) respondents had no knowledge or notice of the condition prior to the adoption; (3) appellant was unadoptable; and (4) it was in appellant's best interest that the petition be granted.

*Discussion*

I. *Substantive Due Process*

■ Appellant first contends that the decree of adoption granted by the court created a family relationship between her and her adoptive parents; that the relationship so created is a fundamental liberty interest and is therefore constitutionally invulnerable to termination on the basis of the factors mentioned in section 227b.

The Fourteenth Amendment of the federal Constitution provides that no state shall deprive any person of life, liberty, or property without due process of law. The California Constitution provides a similar guarantee. (Art.

I, § 7.) "[D]ue process of law has come since the end of the nineteenth century to be applied to the field of substantive rights in the form of the proposition that the legislature, as well as the judiciary, is forbidden to act arbitrarily in contravention of the fundamental principles of liberty and justice that lie at the base of all civil and political institutions of the United States." (13 Cal.Jur.3d, Consumer and Borrower Protection Laws, § 293, p. 731.)

We will assume for purposes of this appeal that the instant case involves state action. Here a state court, pursuant to state statute, nullified an adoptive family relationship created by state statute. (See *Reitman* v. *Mulkey* (1967) 387 U.S. 369, 381-387 [18 L.Ed.2d 830, 838-846, 87 S.Ct. 1627]; *Shelley* v. *Kraemer* (1948) 334 U.S. 1, 20 [92 L.Ed. 1161, 118468 S.Ct. 836, 3 A.L.R.2d 441].)

■ In analyzing a substantive due process claim, we first examine the nature of the interest at issue to determine whether it is a "fundamental right" protected by the Fourteenth Amendment. (See *Moore* v. *East Cleveland* (1977) 431 U.S. 494, 499 [52 L.Ed.2d 531, 537-538, 97 S.Ct. 1932].) Where there is a fundamental right, we must next determine whether the state has significantly infringed upon this right. (See *Harris* v. *McRae* (1980) 448 U.S. 297, 314-315 [65 L.Ed.2d 784, 802-804, 100 S.Ct. 2671].) If so, we then consider whether an important state interest justifies the infringement. (See *Zablocki* v. *Redhail* (1978) 434 U.S. 374, 388 [54 L.Ed.2d 618, 631-632, 98 S.Ct. 673].)

In recent years, the Supreme Court has found various rights to be fundamental and thus within the protection of the due process clause. (E.g., *O'Connor* v. *Donaldson* (1975) 422 U.S. 563, 565-577 [45 L.Ed.2d 396, 401-408, 95 S.Ct. 2486] [the right of the mentally ill to be free of confinement without treatment] and *Roe* v. *Wade* (1973) 410 U.S. 113, 153 [35 L.Ed.2d 147, 177, 93 S.Ct. 705] [a woman's right of choice regarding the termination of pregnancy].) Relevant to family relationships is the court's statement in *Moore* v. *East Cleveland, supra,* 431 U.S. 494, 499 [52 L.Ed.2d 531, 537], " '[t]his Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.' [Citation.]"

■ A natural parent has a liberty interest in the family unit. (See *Moore* v. *East Cleveland, supra,* 431 U.S. 494, 499 [52 L.Ed.2d 531, 537-538]; *In re Carmaleta B.* (1978) 21 Cal.3d 482, 489 [146 Cal.Rptr. 623, 579 P.2d 514].) As the court stated in *In re David B.* (1979) 91 Cal.App.3d 184, 192 [154 Cal.Rptr. 63], "[a] parent's interest in the care, custody and companionship of a child is a 'liberty' to be ranked among 'the most basic of civil rights.' [Citations.]"

Courts have also recognized that natural children have a fundamental, independent right in belonging to a family unit. (See *Smith* v. *City of Fontana* (9th Cir. 1987) 818 F.2d 1411 [children who brought an action for the wrongful death of their father deemed to have a cognizable liberty interest in their familial relationship]; *Duchesne* v. *Sugarman* (2d Cir. 1977) 566 F.2d 817, 825 [the right to maintain the family relationship involves the "interest of the parent in the 'companionship, care, custody and management of his or her children' [citation omitted], and of the children in not being dislocated from the 'emotional attachments that derive from the intimacy of daily association' with the parent . . . ."].)

In *Smith* v. *Organization of Foster Families* (1977) 431 U.S. 816 [53 L.Ed.2d 14, 97 S.Ct. 2094] *(OFFER)*, the court considered whether foster parents enjoyed a constitutionally protected interest in the integrity of the family unit as against New York procedures for removal of foster children from the foster home. The court acknowledged that there exists a " 'private realm of family life which the state cannot enter,' " *(Id.* at p. 842 [53 L.Ed.2d at p. 33], quoting from *Prince* v. *Massachusetts* (1944) 321 U.S. 158, 166 [88 L.Ed. 645, 652-653, 64 S.Ct. 438].) The court discussed the definition of family and its function in our society, observing that while "family" usually implies biological relationships, a biological relationship is not determinative, as evidenced by the marriage relationship. (431 U.S. at p. 843 [53 L.Ed.2d at pp. 34-35].) The court also acknowledged that a familial relationship could be established through the conduct of individuals. *(Id.* at p. 844 [53 L.Ed.2d at p. 35].) "[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot[ing] a way of life' through the instruction of children [citation], as well as from the fact of blood relationship. No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship." *(Ibid.)*

However, the court found differences between the foster family and the natural family, stating, "the State here seeks to interfere, not with a relationship having its origins entirely apart from the power of the State, but rather with a foster family which has its source in state law and contractual arrangements." (321 U.S. at p. 845 [53 L.Ed.2d at p. 35].) The court stated the natural family, in contrast, is based not in state law but "in intrinsic human rights, as they have been understood in 'this Nation's history and tradition.' " *(Ibid.,* quoting from *Moore* v. *East Cleveland, supra,* at p. 503.) The court concluded that where "the claimed interest derives from a knowingly assumed contractual relation with the State, it is appropriate to ascertain from state law the expectations and entitlements of the parties. In this

case, the limited recognition accorded to the foster family by the New York statutes and the contracts executed by the foster parents argue against any but the most limited constitutional 'liberty' in the foster family." (321 U.S. at pp. 845-846 [53 L.Ed.2d at p. 36].)

The status created by adoption has far greater implication than that established by the foster care arrangement. The child and adopting parent sustain towards each other the legal relation of parent and child with all the attendant rights and duties of that relation. (§§ 227, 228.) ▮ Thus, under certain circumstances, an adoptive child, like the natural child, has a liberty interest in his or her family relationship. However, the issue before us is whether the liberty interest or fundamental right has been created where the grounds for setting aside the adoption exist under section 227b.

▮ Adoption has its entire source in state law and contractual arrangements. "The adoption of one person by another was unknown to the common law. The right to adopt a child and the right of a person to be adopted as a child of another are wholly statutory. He who claims that an act of adoption has been accomplished must show that every essential requirement has been complied with. [Citations.]" (*Estate of Taggart* (1923) 190 Cal. 493, 498 [213 P. 504, 27 A.L.R. 1360].) " 'The proceeding is essentially one of contract between the parties whose consent is required. It is a contract of a very solemn nature, and for this reason the law has wisely thrown around its creation certain safeguards, by requiring, not only that it shall be entered into in the presence of a judge, but also that it shall receive his sanction, which is not to be given until he has satisfied himself of these three things: 1. That the person adopting is ten years older than the child. 2. That all the parties whose consent is required do consent, fully and freely, to the making of such contract. 3. That the adoption contemplated by the contract will be for the best interest of the child adopted.' These requirements are there held to be jurisdictional. Unless they coexist, the proceeding for adoption is insufficient, the attempted contract is invalid, the judge is without power to approve it, and there is no lawful adoption. [Citations.]" (*Estate of Sharon* (1918) 179 Cal. 447, 454 [177 P. 283], quoting from *Estate of Johnson* (1893) 98 Cal. 531, 538 [33 P. 460].) Following the Supreme Court's lead in *OFFER, supra,* 321 U.S. at page 846 [53 L.Ed.2d at page 36], we look to the applicable statutes to ascertain "the expectations and entitlements of the parties" in the instant case.

By its enactment of sections 221-230.8 of chapter 2, title II of the Civil Code in effect at times relevant to this case,[3] the Legislature has provided a

---

[3] The adoption statutes are renumbered and reorganized without substantive or procedural change by Statutes 1990, chapter 1363, operative July 1, 1991. Section 227b, in issue here, is renumbered 228.10.

comprehensive scheme establishing the institution of adoption, defining its legal nature, and prescribing its substantive and procedural requirements. The adoption statutes begin by stating that the adoption of a minor child by an adult person may be accomplished "in the cases and subject to the rules prescribed in this chapter . . . ." (§ 221.)

Section 227d prescribes limitations periods for the bringing of actions or proceedings seeking to "vacate, set aside, or otherwise nullify" a decree of adoption. This provision complements judicial recognition in this state that an adoption decree "may be vacated upon such grounds as would entitle the court to vacate any other order or decree." (*Arnold* v. *Howell* (1950) 98 Cal.App.2d 202, 208 [219 P.2d 854].) In *Arnold*, the court vacated a decree of adoption on the ground that the consent of the child's natural father had been obtained through fraud and misrepresentation of the adopting parents. Concluding that consent, when statutorily required, is essential to the court's jurisdiction, the court held that where a natural parent's consent to adoption is obtained through fraud, duress, mistake, etc., the consent is not voluntary and the jurisdictional prerequisite to a valid adoption is lacking. (*Id.* at p. 207.) (See also *In re Yoder* (1926) 199 Cal. 699 [251 P. 205] [order of adoption may be set aside under Code Civ. Proc., § 473 on ground of fraud, mistake, inadvertence, surprise or excusable neglect].) The same principles were applied in an adult adoption (§ 227p) to afford relief to heirs of an adoptive parent whose consent to the adoption was allegedly involuntary (*Adoption of Sewall* (1966) 242 Cal.App.2d 208, 219-220 [51 Cal.Rptr. 367]), and it has been observed that similar relief is available to an adopting parent of a minor child. (*Arnold* v. *Howell, supra,* 98 Cal.App.2d 202, 207.)

Section 227b here at issue requires neither fraud, mistake nor undue influence as grounds to set aside a decree of adoption. The remedy, however, is available upon a legislatively perceived equivalent of mistake—the adopting parents' lack of knowledge or notice of a serious condition predating the adoption which, if known, would have affected their agreement to adopt. It should go without saying that the act of adoption is accompanied by enormous social, moral and financial consequences. (*Michael J.* v. *Los Angeles County Dept. of Adoptions* (1988) 201 Cal.App.3d 859, 875 [247 Cal.Rptr. 504].) " '[J]ust as couples must weigh the risks of becoming natural parents, taking into consideration a host of factors, so too should adoptive parents be allowed to make their decision in an intelligent manner.' " (*Id.* at p. 874, fn. 10, quoting from *Burr* v. *Board of County Com'rs of Stark Cty.* (1986) 23 Ohio St.3d 69 [491 N.E.2d 1101, 1109, 56 A.L.R.4th 357].) Toward that end, section 224s mandates that the prospective adoptive parents be furnished a written report on the child's medical background and, if available, a report on the medical background of the birth parents. The

report must contain all known diagnostic information, including current medical reports on the child, psychological evaluations and scholastic information, as well as all known information regarding the child's developmental history and family life. Section 224s, subdivision (b), further requires inquiry "designed to elicit information on any illness, disease, or defect of a genetic or hereditary nature."

■ The legislative purpose is thus to provide the prospective adopting parents with the kinds of information which may reasonably influence their decision whether to adopt the child. Some adopting parents, such as respondents, may not be able or willing, for various valid reasons, to adopt a child when the provided information presages that the child may require extraordinary care or they believe a normal parent-child relationship would never be established. When the information is incomplete, however, adopting parents in this category may give their consent while unaware of conditions which, if known, would have affected their decision in the first instance. Section 227b serves to retrospectively remedy this gap in the vital information process. (See *Department of Social Welfare* v. *Superior Court* (1969) 1 Cal.3d 1, 6 [81 Cal.Rptr. 345, 459 P.2d 897].)

■ In our view, section 227b does not infringe upon the fundamental rights which may exist in an adoptive parent-child relationship. Instead, it deals with the very creation of that relationship. It prompts inquiry into the conditions existing prior to adoption and into the adopting parents' lack of knowledge or notice of those conditions. The provision further implements manifest legislative purpose that the enduring obligations of adoption be undertaken by the adoptive parents with all information about the child available at the time of adoption and, if not then known, certain pivotal information which becomes available within the limited period of five years after adoption.

We are mindful of and concerned about the welfare of a child once relinquished by her natural parents and now denied adoption under the circumstances presented here. ■ We point out that the superior court has considerable discretion in the matter. Before granting the petition, the court must consider the "welfare of the child, the extent, nature, duration and prognosis as to the disability of the child, the degree of dependency, the length of time of the adoption, [and] the bonds of affection or attachment, . . ." (*Department of Social Welfare* v. *Superior Court, supra,* 1 Cal.3d 1, 6.) The trial court here found, inter alia, that the order setting aside the adoption would be in the best interests of the child. The evidence supports the court's finding.

## II. *Equal Protection*

The Fourteenth Amendment prohibits any state from "deny[ing] to any person within its jurisdiction the equal protection of the laws"; however, a state may effect reasonable classifications among such persons. The California Constitution guarantees the same protection. (Art. I, § 7.) ▮ "There are two standards of review applied by the courts in equal protection questions. The first or conventional standard requires only that differential treatment of classes of individuals has some 'reasonable basis' or bears ' "some rational relationship to [a] conceivable legitimate state purpose." ' (*Schwalbe* v. *Jones* (1976) 16 Cal.3d 514, 517-518 . . . ; *Dandridge* v. *Williams* (1970) 397 U.S. 471, 485 . . . .) A second test or standard has been developed by the courts to be applied to a classification drawn along lines which rendered it 'suspect' in constitutional terms or which touched a 'fundamental interest.' These are generally matters such as race, sex or 'rights explicitly or implicitly guaranteed by the constitution.' (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 17-18 . . . .) In such case strict scrutiny is required and the state bears a burden of establishing that it has a 'compelling interest' which justified the law and that the classification is necessary to further that purpose or interest. (*San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1, 33 . . . ; *D'Amico* v. *Board of Medical Examiners, supra,* 11 Cal.3d at p. 17; *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 16 . . . .)" (*In re Terry D.* (1978) 83 Cal.App.3d 890, 895-896 [148 Cal.Rptr. 221].)

▮ Appellant first contends that section 227b violates the constitutional guaranty of equal protection of the law by discriminating between developmentally disabled or mentally ill adopted children on the one hand and physically ill or emotionally healthy adopted children on the other.

We first consider whether classifications based on developmental disability or mental illness are suspect. In *Cleburne* v. *Cleburne Living Center, Inc.* (1985) 473 U.S. 432 [87 L.Ed.2d 313, 105 S.Ct. 3249], the Supreme Court held the mentally retarded are not a suspect class. In reaching its decision, the court noted "it would be difficult to find a principled way to distinguish a variety of other groups who have perhaps immutable disabilities setting them off from others, who cannot themselves mandate the desired legislative responses, and who can claim some degree of prejudice from at least part of the public at large. One need mention in this respect only the aging, the disabled, *the mentally ill,* and the infirm. We are reluctant to set out on that course, and we decline to do so." (Italics added.) (*Id.* at pp. 445-446 [87 L.Ed.2d at p. 324].)

Similarly, no California court has found that individuals with developmental disabilities or mental illness constitute a suspect class. In *In re*

*Christina A.* (1989) 213 Cal.App.3d 1073 [261 Cal.Rptr. 903], a parent challenged a child dependency statute which required reunification services for parents and children but denied them to mentally disabled parents. Applying the rational basis test, this court held the statute did not violate the constitutional guarantee of equal protection, stating "[i]t is reasonable for the state, before expending its limited resources for reunification services, to distinguish between those who would benefit from such services and those who would not. One of those classes of parents [who would not benefit] is those with a sufficient degree of mental disability . . . ." (*Id.* at p. 1080.)

In *In re Eugene W.* (1972) 29 Cal.App.3d 623 [105 Cal.Rptr. 736], the court rejected an equal protection challenge to a statute which authorized the state to terminate the parental rights of an individual based in part on the individual's mental, not physical, illness. The court stated that the distinction between physical and mental illness is "amply warranted" by "reason of the differing nature of the two disabilities" and the effect it would have on one's ability to parent. (*Id.* at pp. 629-630.)

Where there is no suspect class, the next issue is whether a fundamental right is at issue. Citing *Bowen* v. *Gilliard* (1987) 483 U.S. 587, 601-602 [97 L.Ed.2d 485, 501-502, 107 S.Ct. 3008], and *Lyng* v. *Castillo* (1986) 477 U.S. 635, 638 [91 L.Ed.2d 527, 532-533, 106 S.Ct. 2727], appellant contends that the right to a family unit protected by the due process clause is also fundamental for purposes of triggering strict scrutiny under the equal protection clause. As previously discussed in our substantive due process analysis, appellant can claim no right more basic or fundamental than that given by the very statute which creates it. Therefore, appellant has no fundamental right or liberty interest in her relationship with her adoptive parents. However, relying on *Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187], in which the California Supreme Court held education is a fundamental interest under the equal protection clause of the California Constitution, appellant argues the adoptive family relationship also involves a fundamental interest. While reaffirming the importance of adoptive familial relationships, we do not find any basis for interpreting the fundamental rights of an individual under the California Constitution differently from those found under the United States Constitution.

Thus, since there is neither a suspect classification nor a fundamental right involved in the instant case, the remaining question is whether section 227b meets the rational basis test. ▮▮▮ Under this standard, we must determine whether the Legislature could have reasonably found that the challenged classification would promote a legitimate state purpose. (*Western & Southern L.I. Co.* v. *Bd. of Equalization* (1981) 451 U.S. 648, 671-672

[68 L.Ed.2d 514, 532-533, 101 S.Ct. 2070]; *American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359, 374 [204 Cal.Rptr. 671, 683 P.2d 670, 41 A.L.R.4th 233].) "If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U.S. 61, 78. 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' *Metropolis Theatre Co.* v. *City of Chicago,* 228 U.S. 61, 69-70. 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' *McGowan* v. *Maryland,* 366 U.S. 420, 426." (*Dandridge* v. *Williams* (1970) 397 U.S. 471, 485 [25 L.Ed.2d 491, 502, 90 S.Ct. 1153].)

In *Department of Social Welfare* v. *Superior Court, supra,* 1 Cal.3d 1, 6, the Supreme Court stated that the purpose of section 227b is to "encourage adoptions in the first instance and thus . . . promote the welfare of children available for adoption." Appellant challenges this characterization of the Legislature's intent in enacting the statute, claiming there is no evidence that the statute operates in such a fashion. ▄▄ We need not state our opinion on the matter, because "most fundamentally, the constitutionality of a measure under the equal protection clause does not depend on a court's assessment of the empirical success or failure of the measure's provisions. As . . . explained recently in *Minnesota* v. *Cloverleaf Creamery Co.* [(1981)] 449 U.S. 456, 466 . . . , 'Whether *in fact* the Act will promote [the legislative objectives] is not the question: the Equal Protection Clause is satisfied by our conclusion that the [state] Legislature *could rationally have decided* that [it] . . . might [do so] . . . .'" (*American Bank & Trust Co.* v. *Community Hospital, supra,* 36 Cal.3d 359, 374; italics in original.) Nor can this court ascribe to the Legislature invidious, prejudicial motives without evidence to support such a claim. (*Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control* (1966) 65 Cal.2d 349, 364 [55 Cal.Rptr. 23, 420 P.2d 735]; *Crawford* v. *Los Angeles Board of Education* (1982) 458 U.S. 527, 543 [73 L.Ed.2d 948, 959-960, 102 S.Ct. 3211].)

▄▄ It is unquestioned that the promotion of adoptions is a legitimate state purpose. Without legislation providing for and regulating adoptions, countless children would be left without the care and guidance only parents could provide. The Legislature could have rationally decided that section 227b would promote adoptions in those circumstances where prospective adoptive parents have reasonable concerns about whether the child suffered from a latent condition which would later manifest itself in developmental disability or mental disorder. A limitations period of five years and the

requirement that the condition have preexisted the adoption are reasonable components of the legislative scheme.

Although the primary purpose of adoption is to promote the child's best interests, the adoptive parents' interests also deserve some consideration. (Kawashima, *Adoption in Early America*, 20 J. Fam. L., pp. 677-678.) In making a decision to adopt a child, a couple must be allowed to consider a variety of factors, including their ability to parent a child who they believe may never form an emotional bond with them. For some, this latter factor might be determinative and preclude their ever becoming adoptive parents. Section 227b, however, would encourage adoptions under these limited circumstances. Whether adoptive parents would ultimately avail themselves of its provisions is another question. In some instances, the adoptive parents might decide not to set aside the adoption even where the statutory requirements exist. Encouraged by section 227b to adopt, these adoptive parents might ultimately decide to continue caring for the child despite his or her disability or condition. In others, the set-aside procedure, as in the instant case, might be more beneficial for all concerned. Thus, it is rational to conclude that more adoptions will occur given the alternative afforded by section 227b.

When we consider that the promotion of adoptions is the purpose of section 227b, the distinction between developmentally disabled or mentally ill adopted children and physically ill or emotionally healthy adopted children is clear. There is no statute preventing parents from relinquishing physically ill or emotionally healthy adopted children for adoption. (See § 224m.) Thus, there is no reason to include them in a statute which pertains only to children whose condition renders them unadoptable. Moreover, the importance of emotional attachment or bonding to a successful parent-child relationship is well recognized. (See, e.g., *Santosky* v. *Kramer* (1982) 455 U.S. 745 [71 L.Ed.2d 599, 102 S.Ct. 1388]; *In re Melissa G.* (1989) 213 Cal.App.3d 1082 [261 Cal.Rptr. 894].) Prospective adoptive parents might consider that physically ill or emotionally healthy children would be more likely to bond emotionally with adoptive parents than developmentally disabled or mentally ill children, and thus this group of children would not present a problem the Legislature would be compelled to address. Even if we were to assume that a statute permitting the setting aside of an adoption decree due to physical illness would also promote adoptions, such an assumption would not render section 227b unconstitutional. ██ "As noted in *Dandridge* v. *Williams* (1970) 397 U.S. 471, 486-487 . . . , 'the Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all. [Citation.]' . . . 'The Legislature is not bound, in order to adopt a constitutionally valid statute, to extend it to all cases which might

possibly be reached, but is free to recognize degrees of harm and to confine its regulation to those classes of cases in which the need is deemed to be the most evident.' (*Board of Education* v. *Watson* (1966) 63 Cal.2d 829, 833 . . . .)" (*People* v. *Jerez* (1989) 208 Cal.App.3d 132, 140 [256 Cal.Rptr. 31].)

■ Appellant also contends the statute impermissibly discriminates between developmentally disabled or mentally ill adopted children and the same kinds of natural children. As previously noted, the statutory purpose is to promote adoptions and therefore is unrelated to any concerns involving natural children. Allowing natural parents to petition to set aside their parental rights would not further the state's interest in promoting adoption.

### Conclusion

We hold section 227b does not violate the due process or equal protection clauses of the federal and state Constitutions. Accordingly, the order is affirmed.

Cottle, J., and Bamattre-Manoukian, J., concurred.