[Nos. G010662, G010957. Fourth Dist., Div. Three. Jan. 31, 1992.]

In re JENNILEE T., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
ROBERTA T. et al., Defendants and Appellants.

214

COUNSEL

Dennis L. Cava and Patricia Herzog, under appointments by the Court of Appeal, for Defendants and Appellants.

Terry C. Andrus, County Counsel, and Christopher J. Miller, Deputy County Counsel, for Plaintiff and Respondent.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Minor.

OPINION

SONENSHINE, J.—These consolidated appeals emanate from a juvenile court dependency proceeding involving Jennilee T., born May 4, 1990. In the first, the minor's parents, William H. and Roberta T., individually, contest the court's finding they were gravely mentally disabled, pursuant to Welfare and Institutions Code section 361.5, subdivision (b)(2),[1] and thus incapable of utilizing the reunification services otherwise mandated by subdivision (a) of that section. In addition, William raises an issue as to the statute's constitutionality. In the second appeal, both parents challenge the sufficiency of the evidence to support the court's finding, under section 366.26, subdivision (b)(1), that Jennilee is adoptable.

---

[1]Welfare and Institutions Code section 361.5, subdivision (a) states that except as provided in subdivision (b), whenever a minor is removed from the custody of his or her parents, the juvenile court shall offer child welfare services to the parents "for the purpose of facilitating reunification of the family within a maximum time period not to exceed 12 months."

Pursuant to subdivision (b), "[r]eunification services need not be provided to a parent described in this subdivision when the court finds, by clear and convincing evidence, any of the following:

". . . . . . . . . . . . . . . . . . . . . . . . .

"(2) That the parent is suffering from a mental disability that is described in Section 232 of the Civil Code and that renders him or her incapable of utilizing those services."

Subdivision (c) provides in part: "When it is alleged, pursuant to paragraph (2) of subdivision (b), that the parent is incapable of utilizing services due to mental disability, the court shall order reunification services unless competent evidence from mental health professionals establishes that, even with the provision of services, the parent is unlikely to be capable of adequately caring for the child within 12 months."

Civil Code section 232, subdivision (a)(6) provides for termination of parental rights when the parent or parents "are mentally disabled and are likely to remain so in the foreseeable future." A parent is "mentally disabled," under the statute, if he or she "suffer[s] any mental incapacity or disorder which renders [him or her] unable to adequately care for and control the child." A finding of mental disability must be supported by the evidence of two experts, as described in the statute.

All further references are to the Welfare and Institutions Code unless otherwise noted.

## I.

At the time of Jennilee's birth, Roberta and William were institutionalized, each the subject of a conservatorship. Both have suffered from mental illness for many years and have been hospitalized numerous times.[2] They became friends after meeting at a long-term mental health facility, where they both then resided. They are unmarried.

When Jennilee was six days old she was placed on a hospital hold by the social services agency (SSA). Four days later, on May 14, the SSA filed a petition to declare her a dependent child. It alleged, under section 300, subdivision (g), Jennilee's parents were institutionalized and could not arrange for her care, were unmarried and resided apart, had not arranged for the ongoing welfare of the minor and were incapable of providing for the minor's care. It further alleged both parents had been diagnosed as paranoid schizophrenic. A second count, initially brought under subdivision (g), but subsequently amended to reflect subdivision (b), alleged there was a substantial risk the minor would suffer serious physical harm by the inability of her parents to provide regular care due to their mental illness.[3]

Upon leaving the hospital, Jennilee was placed in the emergency shelter home of Joanne Noyes, where she has since remained. She has made satisfactory progress. To the extent possible, visitation has been arranged between Jennilee and her parents. There is no question they both love Jennilee.

After numerous continuances, the jurisdictional hearing proceeded on October 31. The court found the allegations of the petition to be true, by clear and convincing evidence, and determined the minor came within subdivision (a) of section 300. The court also found there was a substantial danger to the child's physical health and no reasonable means to protect her without removing her from her parents' custody. The court appointed Patricia Yglesias, Ph.D., and David Garland, Ph.D., to perform psychological evaluations of the parents under Evidence Code section 730 and continued the matter to December 18.

The dispositional hearing was ultimately held on January 23, 1991. Testimony was presented by Roberta, William, Dr. Yglesias, and Theresa Carey,

---

[2]William was hospitalized for the first time in 1976, Roberta in 1980.

[3]A third count, under subdivision (b), alleged there was a substantial risk to the minor due to her father's substance abuse in that his "use of controlled substances and excessive use of alcohol are unresolved problems which impair his abilities to care for, supervise or parent the minor." It also alleged that the mother was unable to protect the minor from her father. This count was ultimately stricken by the court.

Roberta's conservator.[4] Also submitted were the reports of the court-appointed psychologists, both of whom believed neither parent was capable of raising a child or of utilizing reunification services. After reading, considering and accepting into evidence the various social service reports and psychological evaluations, the court declared Jennilee a dependent child of the court. (§ 360, subd. (c).) Further, it found by clear and convincing evidence that pursuant to section 361.5, subdivision (b)(2), reunification services need not be provided.[5] A hearing under section 366.26 was set for May 1.

The hearing proceeded as scheduled. The court found by clear and convincing evidence the minor could not be returned to her parents' custody and it was likely she would be adopted. (Welf. & Inst. Code, § 366.26.)[6] It therefore ordered the SSA to undertake adoptive placement.

## II.

Before embarking on the merits of these appeals, we address Roberta's claim that the dispositional order, insofar as it precludes reunification services, is nonappealable.[7] She relies on *In re Rebecca H.* (1991) 227 Cal.App.3d 825 [278 Cal.Rptr. 185].

The *Rebecca H.* court concluded an appeal from an order denying reunification services, made in conjunction with an order setting a permanency planning hearing, is a nonappealable order. It reasoned: "Because the juvenile court must promptly conduct a permanency planning hearing when it rejects reunification entirely (§ 361.5, subd. (f)), a challenge to the complete denial of reunification 'constitutes a direct attack' on a provision in the

---

[4]The parties stipulated that Jane Weiler, who for 21 days had been Jennilee's foster mother at the Noyes emergency shelter home, would testify with respect to her belief that Roberta and William should be given a chance to raise Jennilee because they have done nothing wrong to the child and Roberta dearly loves her.

[5]An addendum to the court's January 23, 1991, minute order states, in pertinent part: "Pursuant to Sec. 232(a)(6), Court finds that mother's illness and father's illness are permanent conditions and that the illnesses are not technically treatable. [¶] Court finds by clear and convincing evidence that pursuant to Sec. 361.5(c) WIC, that competent evidence from mental health professionals establishes that even with the provision of services that parents are unlikely to be capable of adequately caring for the minor within 12 months. [¶] Pursuant to Sec. 361.5(f) WIC, Court orders a hearing pursuant to Sec. 366.25 or 366.26 WIC within 120 days of dispositional hearing. D.S.S. to provide visitation between parents and minor at a minimum of once per month."

[6]The minute order indicates the court made these findings pursuant to section 366.25. We presume this was inadvertent. That section is applicable only to children declared dependents of the court prior to January 1, 1989.

[7]We find it curious that it is one of the appellants who raises the issue of the dispositional order's appealability.

disposition order which sets a section 366.26 hearing. [Citations.] Consequently, the propriety of the juvenile court's refusal to grant reunification is not reviewable by appeal from the dispositional order. (§ 366.26, subd. (k))." (227 Cal.App.3d at p. 836, fn. omitted.) Rather, the court explained, appellate review to determine if reunification services were improperly refused should be sought by means of an extraordinary writ petition. And this should be accomplished prior to the date the section 366.26 hearing is held, so as to permit the granting of seasonable extraordinary relief. (227 Cal.App.3d at p. 836.) In light of its conclusion the order was nonappealable, the court granted the parties' request to treat the appeal as a writ petition.

Counsel for the minor concurs with the above position. County counsel maintains, without authority, the order is appealable. Similarly, counsel for William takes the position the order is appealable; however, he asks us to treat the appeal as a writ petition should we conclude the challenged finding is not reviewable by appeal from the dispositional order.

We agree with *Rebecca H.*'s rationale. The challenged order is nonappealable because it is a direct attack on the order authorizing a hearing under section 366.26. Thus, it is reviewable only by writ petition. (§ 366.26, subd. (k).) However, as the court did in *Rebecca H.*, we treat the ineffectual appeal as a petition for extraordinary writ. (See also *In re Catherine S.* (1991) 230 Cal.App.3d 1253, 1256 [281 Cal.Rptr. 746].)

III.

We turn now to William's constitutional challenge. He argues section 361.5, subdivision (b)(2), as applied, violated his constitutional right to due process of law. He maintains instead of exempting from reunification services parents who have *no possibility of being united* with their child, the statute exempts those parents who are *unlikely to benefit*. This, he insists, deprived him of his liberty interest in the care and custody of his daughter. The court in *In re Christina A.* (1989) 213 Cal.App.3d 1073 [261 Cal.Rptr. 903] was faced with virtually the same issue.

In *Christina A.*, the appellant-mother was diagnosed by two mental health professionals, i.e., a psychologist and a physician, as suffering from episodic alcoholism and a borderline personality disorder. Both experts believed she was incapable of parenting her children and she would be unable to benefit from reunification services. At the dispositional hearing, the court made findings consistent with section 361.5, subdivisions (b)(2) and (c). At the permanency planning hearing four months later, the court made a permanent plan of guardianship for the appellant's three children.

On appeal, the mother claimed section 361.5, subdivision (b)(2) and Civil Code section 232, subdivision (a)(6) were unconstitutionally vague. She contended the term "mental disability" should be defined in accordance with former Civil Code section 232 which, before its 1983 amendment, permitted termination of parental rights due to a parent's "mental deficiency or mental illness." She argued, "[I]f we reject this definition the statutes are unconstitutionally vague because their meaning must be guessed at and is inherently subjective." (213 Cal.App.3d at p. 1078.)

The appellate court disagreed, stating: "Vagueness occurs 'when a legislature states its proscriptions in terms so indefinite that the line between innocent and condemned conduct becomes a matter of guesswork. This indefiniteness runs afoul of due process concepts which require that persons be given fair notice of what to avoid . . . .' " (213 Cal.App.3d at p. 1078.) However, the court found there was no constitutionally protected interest at stake to which the mother's vagueness claim would apply. "The requirements of due process 'apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property.' [Citation.] Appellant's only conceivable argument is that she has a constitutionally protected interest in receiving reunification services. But if this is a property right to a 'benefit,' . . . she must show more than a desire or an expectation of the benefit; she must show an entitlement to it. [Citation.] She has failed to do this. And if her claim is that the deprivation of reunification services interferes with a constitutionally protected liberty interest in 'the companionship, care, custody, and management' of her children [citation] she must establish that the statute violates due process or equal protection." (*Id.* at pp. 1078-1079.) The court continued: "Appellant's vagueness claim is essentially an argument that the statute gives insufficient guidelines to those charged with its enforcement to ensure that they will correctly discriminate between those parents to whom it should apply and those to whom it should not. This is a procedural due process argument. [¶] Examined as such, we are satisfied the statute adequately protects against the kind of arbitrary enforcement which a claim of vagueness envisions. . . . The petitioner had the burden of proof to establish, through evidence of 'competent mental health professionals' that appellant came within the provisions of section 361.5, subdivision (b)(2). While this evidentiary burden is considerably less than that required to support a finding of mental disability under Civil Code section 232, subdivision (a)(6), that difference is appropriate to the distinction between a finding that a parent should not be afforded reunification services, and a judgment terminating parental rights." (*Id.* at p. 1079.)

The *Christina A.* court concluded that under section 361.5, subdivision (c), reunification services must be ordered "unless competent [medical] evidence

from mental health professionals establishes that, even with the provision of services, the parent is unlikely to be capable of adequately caring for the child within 12 months." The court held that this creates a permissible legislative classification: "It is reasonable for the state, before expending its limited resources for reunification services, to distinguish between those who would benefit from such services and those who would not. One of those classes of parents is those with a sufficient degree of mental disability that, even were they provided services, would still be unable to care for their children within a year . . . ." (213 Cal.App.3d at pp. 1079-1080; see also *Adoption of Kay C.* (1991) 228 Cal.App.3d 741, 752 [278 Cal.Rptr. 907].)

We agree with *Christina A.* that section 361.5 is not unconstitutional on its face. Moreover, it presents no constitutional infirmity as applied in the present proceeding. Drs. Garland and Yglesias both testified that William was incapable of utilizing any reunification services due to his mental disorder.

■ William further claims that application of the statute denied him the right to due process of law in that he was deprived of his protected liberty interest in the companionship, care and custody of his daughter. He argues, "Since the deprivation of reunification services was tantamount to a termination and severance of parental rights, it interfered with [his] constitutionally protected liberty interest in the 'companionship, care, custody, and management' of his children." He cites *Michael H.* v. *Gerald D.* (1989) 491 U.S. 110, 121 [105 L.Ed.2d 91, 104-105, 109 S.Ct. 2333] for the proposition a liberty interest is created by biological fatherhood. He also cites *Franz* v. *United States* (9th Cir. 1983) 227 App. D.C. 385 [707 F.2d 582, 602], where the court stated: "Severance of the relationship between a parent and his child will survive constitutional scrutiny only if four requirements are met: (a) the asserted governmental interest must be compelling; (b) there must be a particularized showing that the state interest in question would be promoted by terminating the relationship; (c) it must be impossible to achieve the goal in question through any means less restrictive of the rights of parent and child; and (d) the affected parties must be accorded the procedural protections mandated by the Due Process Clauses."

William does not dispute protection of children from harm is a compelling state interest. However, he maintains the state also has an interest in preserving the family. Thus, the statute denied him the opportunity to participate in services which could have fostered the state's interest in preserving family ties. The gist of his argument is since termination of parental rights is such a drastic remedy to be applied only in extreme cases, fundamental fairness dictates a parent be afforded every possibility of retaining his or her parental

rights. In his case, because he was denied reunification services, he was afforded no possibility at all.

Based on this record, William claims there is a *possibility* he could be reunited with his daughter were he offered reunification services. Acknowledging his major problem in fighting his schizophrenia was his refusal to stay on medication,[8] he argues that, had reunification services been provided, he might have progressed to the point where he could have adequately cared for his child.[9] He contends with reunification services, the fear of losing his daughter forever might have sufficiently motivated him to stay on his medication. Thus, because there is an alternative to terminating his parental rights, the state's interest in preserving family ties could possibly have been served had he been given the opportunity to utilize the services. He directs us to Dr. Yglesias's testimony that the county health department provides day care treatment programs for individuals suffering from schizophrenia. Notwithstanding the psychologist's belief he would not take advantage of such services because he had not done so previously, he argues he would have been motivated to do so had he known he had one last chance to retain his parental rights.

In short, William insists fairness mandates affording a parent reunification services "unless there is absolutely no possibility of the parent ever being united with his or her child." This argument is entirely speculative, and it is therefore inconsistent with the state's interest in affording children the stability of a permanent home within a definite time period.

Additionally, William's "due process" characterization of his argument does not serve to distinguish it from the equal protection claim addressed by the court in *Christina A.* Indeed, his challenge is premised on the fact individuals who are mentally disabled are treated differently from those who are not: they are denied reunification services. If mentally disabled parents were given reunification services, there is a chance reunification might occur. They are entitled to this last chance. However, as previously indicated, the *Christina A.* court concluded it is reasonable for the state to make the distinction. (*In re Christina A., supra*, 213 Cal.App.3d at p. 1080.) We believe that conclusion applies to William's due process claim.

---

[8]William apparently believes he does not require medication and thus has been adverse to taking any. It is apparently during these times that he exhibits paranoid tendencies. At the section 366.26 hearing, however, he testified that he takes 150 milligrams of thorazine and "some" tegretol 3 times each day. He said these medications help to calm him down.

[9]He claims "it is possible that his love for his daughter and the fear of losing her forever would sufficiently motivate him to stay on his medication. There does not appear to be any evidence in the record to suggest that, even if he stayed on his medication, he would be unable to take care of himself and the minor."

## IV.

The parties contend the record does not establish the experts were statutorily qualified to render their opinions. The contention is without merit. In discussing this issue, we are mindful of the fact that, as Roberta points out in her brief, a finding reunification services should be withheld should not be taken lightly because it is tantamount to terminating parental rights under section 366.26, subdivision (c)(1).[10]

Pursuant to Civil Code section 232, subdivision (a)(6), evidence of mental disability must be established by "any two experts, each of whom shall be either a physician and surgeon, certified either by the American Board of Psychiatry and Neurology or under Section 6750 of the Welfare and Institutions Code, or a licensed psychologist who has a doctoral degree in psychology and at least five years of postgraduate experience in the diagnosis and treatment of emotional and mental disorders . . . ." The parents contend the record does not establish Drs. Yglesias and Garland met the foregoing qualifications.

The SSA and the minor contend neither parent objected at trial to the experts' qualifications; thus, any error is deemed waived and cannot be asserted on appeal. (*People* v. *Welch* (1972) 8 Cal.3d 106, 114-115 [104 Cal.Rptr. 217 [501 P.2d 225]; *Haskell* v. *Carli* (1987) 195 Cal.App.3d 124, 129 [240 Cal.Rptr. 439]; *In re Heidi T.* (1978) 87 Cal.App.3d 864, 876 [151 Cal.Rptr. 263].)

Moreover, nothing in the record casts doubt on the qualifications of the experts. As counsel for the minor points out, Dr. Yglesias's letterhead indicates "clinical psychologist" and bears her California license number, and at the end of each of Dr. Garland's reports, there appears the notation, "Clinical Psychologist, Licensed." Counsel further states if the record must include the experts' qualifications, this court may take additional evidence, pursuant to Code of Civil Procedure section 909, without remanding the matter to the trial court.

We find unpersuasive William's contention his failure to object does not preclude him from raising the issue on appeal on the ground the error is one of law, resulting in a denial of his constitutional right to due process. (*People* v. *Chambers* (1964) 231 Cal.App.2d 23, 27-29 [41 Cal.Rptr. 551]; *People* v. *Mills* (1978) 81 Cal.App.3d 171, 176 [146 Cal.Rptr. 411].) He argues since

---

[10] That subdivision provides a finding under section 361.5, subdivision (b) that reunification services should not be offered constitutes a sufficient basis for terminating parental rights, unless the court finds termination would be detrimental for any one of four stated reasons.

the order was not predicated on competent evidence, he must be deemed to have been deprived of his constitutional right to due process of law. He further argues it is fundamentally unfair to terminate a father's parental rights when competent evidence does not support the juvenile court's order. (*Moore* v. *East Cleveland* (1977) 431 U.S. 494, 499 [52 L.Ed.2d 531, 537-538, 97 S.Ct. 1932].) Finally, he maintains because the evidentiary standard is mandated by statute, and it was not met, he is not precluded from arguing on appeal the evidence is insufficient as a matter of law. He cites *In re Catherine S., supra*, 230 Cal.App.3d 1253, 1258, where the court vacated an order under section 361.5, subdivision (b)(2) on the ground one of the experts was unlicensed; he was exempt from the licensing requirements. There, an objection was made in the lower court. Nonetheless, the appellate court, noting there was no question the expert had the requisite training, stated: "But we are dealing with a statutorily mandated standard of the evidence required to support a finding of mental disability. That standard was not met here. The court's ruling was unsupported by substantial evidence. The concept of harmless error plays no role in an analysis of the sufficiency of evidence to support a ruling. If the ruling was unsupported by substantial evidence, it is necessarily reversible." (230 Cal.App.3d at p. 1258.)

Unlike *Catherine S.*, however, the error here is the failure to state the requirements on the record. Neither William nor Roberta claims the experts were not properly qualified.

## V.

■ Finally, we reject the parties' contention the evidence does not support the court's finding of adoptability. As we explained in *In re Amelia S.* (1991) 229 Cal.App.3d 1060 [280 Cal.Rptr. 503], "[I]t is not necessary pursuant to section 366.26, subdivision (c)(1) that the child, at the time of the termination hearing, already be in a potential adoptive home. Rather, what *is* required is clear and convincing evidence of the *likelihood* that adoption will be realized within a reasonable time." (*Id.* at p. 1065.)[11]

William, however, contends the essence of *Amelia S.* is found in the following discussion: "[T]he mere fact that it is possible the minor might be adopted since prospective adoptive parents are interested does not constitute clear and convincing evidence of the minor's adoptability." ■ Clear and convincing evidence "must be so clear as to leave no substantial doubt; it must be sufficiently strong to command the unhesitating assent of every

---

[11]Roberta mischaracterizes our holding. Contrary to her assertion, we did not say that a finding of adoptability requires "a family ready to adopt the child." Indeed, adoptive parents need not be "waiting in the wings."

reasonable mind. [Citations.]" (*In re Victoria M.* (1989) 207 Cal.App.3d 1317, 1326 [255 Cal.Rptr. 498].) He argues clear and convincing evidence is lacking here.

On cross-examination, the social worker testified a neurological examination revealed the minor was at risk for developmental problems and further testing was recommended. She did not believe this would interfere with adoption. In fact, she said "the family that we had identified other than the relative had indicated that they were willing to accept a child with such a background and all the attendant risks." However, she admitted it was possible the family would not bond to Jennilee and adoptive placement would be precluded.

The thrust of William's position is, if it is determined the minor is at risk, it might be difficult to find someone who will actually adopt her. He insists until the geneticist completes an evaluation of the case and all the test results have been analyzed, there is a substantial doubt the identified family, or any other family, will adopt the minor. Thus, until the test results are in, it is "sheer speculation that any family, including the minor's out-of-state relative, will adopt the minor."[12] For this reason, he argues it cannot be said there is no substantial doubt she will be adopted.

Roberta shares William's view. She relies on the social worker's use of the term "potential" to describe the resources available for adoption. She argues this term casts doubt on the "likelihood" of adoption. We disagree.

There is sufficient evidence adoption was likely to occur in the foreseeable future. At the May 1 hearing, the social worker from the adoption division testified the minor's current foster family did not wish to adopt her. However, another family within the system expressed an interest. Further, while that family was being considered, an out-of-state relative—a maternal great aunt—came forward, requesting adoptive placement. However, in light of the structure of the interstate compact, it was essential Jennilee be already freed for adoption before pursuing that possibility. Moreover, the social worker said even if specific families had not been identified as potential adoptive placements, she believed Jennilee was "generally adoptable." The child was functioning appropriately for her age level; thus, even without the test results, she would be deemed adoptable. The social worker's report stated any possible neurological problems were subtle as they did not interfere with the child's acquisition of developmental skills. And three

---

[12]County counsel insists that the evaluation of the geneticist is not necessary to determine adoptability. Moreover, no evidence was presented that Jennilee was *not* adoptable; it was all conjecture.

additional families outside the system expressed an interest but had not yet been investigated, in light of the relative's request.

In reaching its conclusion Jennilee was likely to be adopted, the court recognized it may not even be known until the child reaches her teenage years whether she has any dysfunction. Noting her parents did not manifest their difficulties until late in their development, the court stated: "So while it would be attractive to know more about the child, I don't think it's going to make much difference as to the adoptability of the child." Thus, the results of the testing would not necessarily help the agency in placing Jennilee. The court also commented: "Obviously, you're going to have to reveal to any pre-adoptive parents what the genetic background is and see if they still wish to take the child with that kind of potential."

Finally, unlike the situation in *Amelia S.*, the circumstances of this case do not fall within any of the criteria of section 366.26, subdivision (c)(3). That subdivision provides a minor may be found to be difficult to place for adoption if there is no identified or available prospective adoptive parent *because* the minor is a member in a sibling group, the minor has a diagnosed medical, physical, or mental handicap, or the minor is more than seven years old. Consequently, there is nothing to refute the evidence Jennilee was a likely candidate for adoption.

Orders affirmed.

Sills, P. J., and Wallin, J., concurred.

A petition for a rehearing was denied February 27, 1992, and appellants' petition for review by the Supreme Court was denied May 14, 1992.