Filed 5/29/15  In re Iris V. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re IRIS V. et al., Persons Coming Under the Juvenile Court Law. | B258884 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TRACY M.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK82307 |

APPEAL from orders of the Superior Court of Los Angeles County.  Debra Losnick, Juvenile Court Referee.  Affirmed.

Cristina Gabrielidis for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Tyson B. Nelson, Deputy County Counsel, for Plaintiff and Respondent.

_____

Iris V., age five at the time of the hearing below, has lived with her foster mother continuously for four years, since she was detained from her mother, Tracy M. (mother), due to domestic violence involving mother, her male companion, and her father. Jacob M., age three, has lived with the same foster mother all his life. The Los Angeles County Department of Children and Family Services (DCFS or the department) offered mother family maintenance and reunification services as to both children unsuccessfully for four years. Pursuant to Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i),[1] the juvenile court terminated parental rights in favor of adoption by the foster mother. Mother contends the court lacked evidence to terminate her parental rights because she had formed a parental relationship with the children such that adoption would be detrimental to them. We disagree and therefore affirm.

## BACKGROUND

In May 2010, mother, age 19, lived with her father, Stephan M., Iris V., her one-year-old daughter, and Bryce and William, her boyfriend and ex-boyfriend, respectively, in Stephan M.'s house.[2] Mother's mother had died in September 2009.

Mother had few parenting skills and no source of income, and was dependent on Stephan M. for food and clothing both for herself and Iris V. A licensed marriage and family therapist assessed mother as suffering from depression, panic attacks, "problems in all areas of functioning," and impaired intellectual functioning that the therapist labeled as mild "mental retardation." Mother had terminated her relationship with William some months prior and had obtained a restraining order against him, but Stephan M. approved of William and disapproved of Bryce. He permitted William to live in the home (as well as Bryce), and told mother she would not be permitted to take any food or clothing with her if she moved out.

---

[1] Statutory references will be to the Welfare and Institutions Code.

[2] Abel V., Iris V.'s father, does not appeal.

2

During a DCFS assessment, mother demonstrated inappropriate care of Iris V. She let the child crawl away unnoticed and unattended, neglected to change her soiled diaper, and after repeated prompting from Stephan M. to feed the baby, gave her a bottle filled with cereal that was too thick to fit through the hole in the nipple. Iris was nevertheless assessed to be a happy, active, alert baby of proper health, weight and development, "well maintained and nourished."

William was physically, emotionally and sexually abusive toward mother, and would often initiate sex with her when she was asleep even though she told him she did not want sex with him. Mother was one month pregnant by William, but did not want the baby.[3] Stephan M. was also physically and emotionally abusive toward mother. He suffered from alcohol and drug abuse problems, and wanted her to end her relationship with Bryce, whom he thought was disrespectful toward him, and to mend her relationship with William.

DCFS deemed this living arrangement to be hazardous to Iris V., and detained her with mother's consent, the juvenile court ultimately sustaining a petition that alleged domestic violence by William against mother endangered the child. Iris was placed into a foster home and mother was ordered to attend individual counseling to address case issues, including domestic violence, and to take all prescribed medications. She was granted monitored visitation, with DCFS retaining the discretion to liberalize visits.

For the six month review hearing, DCFS reported mother had substantially complied with the case plan. She had sought and received referrals, bus passes and assistance from DCFS, completed a 10-week parenting course, and visited Iris V. semi-regularly. Although she had been discharged from one counseling program for lack of effort to attend sessions, she was enrolled in and attending another counseling program. She had been assessed as suffering from depressive disorder, parent-child relational problems, and "a disorder of written expression." Monitored visitation with Iris was scheduled to occur twice a week for an hour and a half each visit, never having been

_____

[3] Mother miscarried in August 2010.

3

liberalized by DCFS. Mother often failed to call the foster mother to confirm visits, and because of that did not see her every weekend. On at least three occasions, mother went a few weeks without visiting. She had one month of Mommy & Me swimming lesions with Iris, but on one weekend visit, "Iris began kicking and hitting her mother." Mother did not intervene to stop Iris from hitting her, and when the foster mother offered some cues on how to decrease the behavior, mother "showed no reaction." Stephan M. often accompanied mother on visits.

DCFS reported mother continued to be in an abusive relationship with Stephan M., who in July 2010 kneed her in the stomach knowing she was pregnant and asked her to get an abortion. In August 2010, Stephan M. was arrested for punching Bryce. Also in August, mother arrived for a visit wearing pants that were soaked in blood, stating she was having a miscarriage but had been turned away from the hospital. Mother had a second miscarriage in December 2010. Mother continued to live with Stephan M., but frequently reported he had evicted her from the home, leaving her with no place to stay. She refused to consider a shelter, stating she did not want to be separated from Bryce.

By March 2011, mother lived alone in the home of her recently deceased grandmother, but having little food, no income and no means of paying utility bills, she relied on Stephan M. for everyday needs. In November and December 2010 and January 2011, mother repeatedly and actively avoided contact with her case social worker, her parent partner, and Iris V.'s physician, sometimes being heard to instruct whoever answered her phone to say she was not home. She made no effort to find employment, and typically spent her days sleeping, arguing with friends and Stephan M., and watching television.

Mother had been prescribed no medications, and she resisted efforts to receive a more in-depth mental health evaluation for purposes of medication. She denied she suffered from any developmental delay.

By June 2011, mother was receiving general relief funding (§ 17000), had set up an appropriate bed for Iris V. in a room in her grandmother's home, and was "doing much better with handling issues of responsibility," as reported by her therapist.

"Improvements include[d] in areas of cooking, cleaning, and attending scheduled appointments on a more consistent basis." Mother continued in her individual counseling, where she "showed motivated participation in her sessions and [was] attending on a regular basis," and had been prescribed and was taking psychotropic medication for her depression. Mother was visiting Iris V. more regularly and was doing well in the visits and bonding with the child, although her therapist and the foster mother reported they felt mother demonstrated more a "friend type" relationship with Iris than a parental one. Mother's altercations with Stephan M. appeared to be escalating, however, and she was once observed walking down the street carrying a suitcase at 6:30 a.m., crying and distraught because he had asked her to leave her grandmother's residence.

In August 2011, DCFS reported concerns that mother, who in July had reported she was again pregnant, neglected to seek prenatal care, and later reported she was no longer pregnant and had also stopped eating because she was "not hungry." DCFS was also concerned that although mother reported she lived alone in her grandmother's house, it appeared she was concealing that Stephan M. and Bryce also lived there. DCFS was concerned that although visitation with Iris V. had been liberalized to unmonitored visitation so long as neither Stephan M. nor Bryce attended, both continued to be present at visits. And on one occasion, mother did not know what to do with Iris when the child was vomiting, so she called the foster mother to come retrieve the child. Mother continued to be dependent upon Stephan M. for everyday tasks such as purchasing groceries.

In October 2011, mother, now seven months pregnant with Bryce's child, engaged in a domestic dispute with Bryce. Bryce was arrested, and mother was coerced by Stephan M. to file several restraining orders against him, which she repeatedly violated by moving in with him, admitting she did so to get away from Stephan M. She discontinued psychotropic medication due to the pregnancy and instead took prenatal vitamins. Mother completed five months of individual counseling sessions, after which she was referred to "a higher level of care" to continue her progress. DCFS reported mother "continued to be entrenched in domestically inappropriate relationships with"

5

Stephan M. and Bryce, and although she attended weekly conjoint counseling sessions with Stephan M., she reported her relationship with him remained the same. In November 2011, mother enrolled in and attended domestic violence group counseling sessions.

Mother's visitation with Iris V. was now consistent, but she continued to appear at the visits accompanied by Stephan M. and Bryce and rarely used the entire two hours allotted, frequently terminating visits after 60 or 90 minutes. The foster mother reported mother rarely brought items such as toys, coloring books or food to the visits, and was "not showing a strong capability of providing care to her daughter for extended periods of time."

DCFS reported that Iris V. was "doing very well at her placement," having "completely blossomed into a beautiful little girl since her placement with [foster mother]." She was "very personable, vocal, and outgoing, a drastic difference from when [she] first entered the foster care system," and "appear[ed] to be very bonded to foster mother and her family."

In December 2011, mother gave birth to Bryce's son, Jacob M. He was immediately detained and placed in the foster home with Iris V.

Bryce was arrested three times in March 2012 for repeatedly violating court orders restraining his access to mother, the violations sometimes occurring when mother voluntarily visited him.

In May 2012, DCFS reported mother was in compliance with her case plan but the social worker was "concerned about [her] ability to parent two young children given her cognitive and developmental limitations." After Jacob M. was born, she enrolled in and completed with Stephan M. an additional parenting course. Mother also enrolled in both individual and group domestic violence counseling and attended sessions regularly for many months, demonstrating, according to her counselors, genuine interest and motivation toward regaining custody of her children. She reported she had discontinued her relationship with Bryce, although the DCFS social worker doubted this was true, in part because Bryce was reportedly seen with her several times in March 2012.

6

Mother also sought and obtained additional mental health therapy as recommended, and "increased her ability to verbalize her needs/feelings, learned self regulation/coping skills, decreased her isolation and increased her appetite to an appropriate level." Findings from a psychological evaluation stated mother had difficulty with processing written material, organization, problem solving, completing tasks, recognizing similarities in events, and following written instruction. The findings stated she would need help with structure in daily living and dealing with anxiety and depression, and would likely experience episodes of frustration and confusion. The target date by which she could start receiving such support services if found eligible was August 2012.

Mother's visits with her children were considered by DCFS to be "adequate," although she needed to work on being more assertive in her parenting, creating boundaries with the children, and taking initiative. No negative incidents were reported. Nevertheless, DCFS reported mother "struggle[d] with comprehension, processing information, recognizing potentially dangerous situations, remembering instructions given to her, confusion and anxiety." Citing her "developmental delays," her continued dependence on Stephan M. for help with daily life, and Stephan M.'s physical abuse of her in July 2010, DCFS recommended that reunification services with Iris V. be terminated and adoption of the child pursued.

The juvenile court terminated reunification services as to Iris V. on August 8, 2012, more than two years after she was detained.

Over the next year and a half, the juvenile court held seven permanency hearings. For the December 2012 and January 2013 hearings, DCFS reported mother had completed her domestic violence victim group therapy program and visited Iris V. every Wednesday for two and a half hours. The visits were "strong to adequate," but mother sometimes had trouble giving directives to Iris. DCFS reported Iris's foster mother was committed to adopting the child, was well able to meet her needs, and was open to the child retaining contact with her biological family. Iris had "blossomed into a healthy preschooler" and was attached to the foster mother and her family.

7

For the September 2013 hearing, DCFS reported mother was receiving services through Options for Independence (Options), an organization that provides multi-level assistance in areas of education, counseling and assisted living. Options was contracted through the Regional Center for four to five hours of service per day, extended on visitation days to eight hours. Mother had started eight-hour monitored visits with Iris V. and Jacob M., had a "supportive live-in boyfriend," Michael C., and a "supportive father" (Stephan M.) who lived a couple blocks away. DCFS reported mother was improving and the visits went well, although mother sometimes had a hard time multitasking. Iris and Jacob were very active children, and mother required frequent prompting from the monitor and an Options aide regarding basic needs such as feeding and suggestions on appropriate discipline and boundaries. DCFS reported, "mother continues to need constant prompting from the monitors during the monitored visits. During the visits, mother has people around her as support, and they assist mother during the visits with the children. The monitor is present; mother's boyfriend is usually present as well as maternal grandfather." When mother would have to take Iris to the bathroom, she would rely on others to watch Jacob. Michael interacted with Iris more than mother did, and she would become frustrated when Jacob was fussy and end visits 20 to 30 minutes early. Mother was employed at a grocery store through a supportive employment program and appeared to once again be pregnant, although she denied to the social worker that she was. Michael C. was employed full time.

Iris V. frequently asked when she would be able to "see mommy," and at the end of a monitored eight-hour visit asked if she could "sleep over at mommy's house."

Options reported that mother did an excellent job handling the children during visits. She was able to feed them, read to them, make them take naps, and bathe and dress them. She had "an infrastructure in place to support her in parenting her children," in the form of a "nurturing and supportive live-in boyfriend and a supportive father," and was eligible for 80-plus hours of service from Options per month. The two abusive ex-boyfriends were no longer in the picture, and she was "in a healthy relationship with a man who is willing to share his life with her and her children." She had set aside and

8

decorated a bedroom for the children, the adults living in the living room. Options recommended a 60-day home-of-parent placement.

DCFS rejected the recommendation. It reported that although mother had made progress and was in compliance with court ordered programs, the agency continued to have "serious concerns regarding mother's ability to care for" the children due to her developmental delays, especially with respect to Jacob, who suffered delays in his gross and motor skills and required intensive services through the Regional Center. Mother was limited in her ability to appropriately supervise Jacob and to remember to feed him and change his diapers. She was limited in her ability to recognize hazardous situations, as when Jacob one time almost pulled a chair over on himself as she watched, unreacting. Both children were thriving in their foster home, and DCFS recommended that reunification services be terminated as to Jacob.

For a November 2013 review hearing, DCFS reported the children had strongly bonded with their foster mother, who was "exceptionally patient and calm with Iris and [spoke] softly and clearly but also firmly to impress upon Iris the importance of following through with the desired behavior or action." Although Iris V. was doing well, she had lately demonstrated escalating oppositional behaviors, and was "very strong-willed and determined to get her way." She was diagnosed with Oppositional Defiant Disorder, required Wraparound Services, and suffered from a speech impediment. Both children demonstrated early signs of special needs, and it was observed that during visitation, Options personnel were proactive in ensuring the children's safety but mother "appear[ed] to have a limited capacity to be preemptive with identifying possible dangers to the children. This [was] certainly applicable to situations where [mother was] required to multitask."

Mother's work situation interfered with the weekly eight-hour visits, and she failed to show up for three scheduled visits, after which her slot at the Family Visitation Center was terminated. She enlisted Options to make a new arrangement, but none were ever made.

In December 2013, mother gave birth to a third child, Claire C.[4]

In January 2014, DCFS reported mother did not appear to be "mentally able to personally be responsible for attending to daily responsibilities," but instead required significant assistance from Michael C. and Stephan M., and, due in part to their own developing special needs, "would not be able to care for the children if the Options for Independence staff were not in attendance." Visits with the children continued to go well, but mother was unable to recognize hazardous situations—such as when Jacob wanted to play with a fan—and continued to need "constant prompting" from the monitor, as she was "easily overwhelmed and ha[d] difficulty with multitasking and curbing challenging behavior exhibited by the children."

DCFS reported the results of mother's psychological evaluation at the Lanterman Regional Center in April 2012. Her ability to listen, pay attention and understand was at a 3.7-year level, her ability to interact with others at a 5.7-year level, and ability to gather and provide information, use time, money and the telephone, and demonstrate responsibility and sensitivity to others ranged from a 7.6- to 12.9-year level. Her IQ score was 70 and her perceptual reasoning and working memory indices 71.

A new social worker, Robert Dennis, took over the case in October 2013. He speculated in a January 2014 report that Options any change in the visitation schedule that would "affect their ability to bill for more hours and receive funding," and it discontinued visitation at the DCFS Visitation Center "due to the financial impact to the organization if visitation was reduced." Options personnel and Stephan M. took exception to the report, and during a home eight-hour visit between mother and the children on January 31, 2014, engaged in what Dennis characterized as "a caustic interaction" with him in front of the children and braced him with a "flurry of accusations" regarding his desire to adopt out the children for financial gain. DCFS

---

[4] Although a DCFS referral was generated as to Claire C., she is not a subject of these proceedings.

10

subsequently moved visitation back to its office and sought to return monitored visitation to the DCFS Visitation Center.

Once visitation was moved back to DCFS, mother was "proactive in bringing supplies to include snacks, a play tent, and toys and drawing and coloring materials. Michael [C. was] also observed to engage with the children, using his cell phone to play music to initiate everyone to start dancing together along with one-on-one activity such as drawing/coloring while [mother] focuses attention on the other child." DCFS excluded Stephan M. and Options personnel from the visits due to their interference with mother's interaction with the children and their ongoing caustic interaction with DCFS staff. During a visit in March 2014, mother, too, accused a DCFS social worker of wanting to take the children from her for money. She repeatedly told the children they would be coming home the next month despite being admonished by monitors she should not do so, and when further confronted, turned away from the visit to contact her attorney. The three-hour visit was terminated after 30 minutes.

During one visit, mother permitted Iris to draw all over her (mother's) arms and face with a red marker. The children's daycare provider reported that the children were difficult to manage upon return from visitation with mother.

Abel V., Iris V.'s father, indicated he wanted Iris to be adopted by her foster mother. He expressed a significant concern that she not be returned to mother, who could not care for her due to her cognitive limitations and who was still in a negative relationship with Stephan M., her father. Bryce M. adamantly expressed identical sentiments regarding Jacob M.'s placement, and further reported he had received an emailed video from mother depicting her in sexual activity at a party at which Stephan M. appeared to be present. Although not expressly crediting this report, DCFS remained gravely concerned about Stephan M.'s past conduct and ongoing domineering personality.

Mother and Stephan M. refused to cooperate in mediation designed to develop a post-adoption contact agreement.

11

Mother stopped participating in therapy in 2013 and stopped taking her medications, stating she did so because she felt "happy" and no one informed her she should continue in therapy. She missed three visits in March 2014 and felt she was being victimized by DCFS. She reenrolled in therapy in early 2014 at DCFS's urging, and represented that she had been represcribed her medications, although this could not be verified. Mother's therapist was impressed with mother's "tremendous progress" and "emotional maturity." She seemed "responsible and connected" to her new baby, was very nurturing and able to soothe and comfort the baby appropriately, and was able to accept feedback "gracefully" and adjust her parenting accordingly. She had broken her relational and behavioral patterns of domestic violence, had not "given up" on reuniting with Iris V. and Jacob M., and had "good support" from Stephan M., Michael C., and Michael C.'s mother. Although she was frustrated with DCFS, she expressed her frustration in an appropriate manner. The therapist stated she was "surprised that the Department of Children and Family Services are blind to th[ese] factors and dismiss [mother's] progress and continue to hinder . . . her process." She stated that "[b]ased on [her] clinical observations and the dynamics mentioned above, not only [is it] safe to suggest but [she was] also confident to recommend for [mother] to be awarded having her children returned to her custody."

DCFS continued to be of the opinion that mother would be unable to manage three children simultaneously.

Mother filed section 388 petitions on December 11, 2012, July 1, 2013, November 5, 2013, and December 30, 2013, requesting unmonitored visits and, in the final petition, return of Iris and Jacob to her. The first two petitions were summarily denied. At the contested hearing on the remaining 388 petitions, mother and a monitor from Options testified the latest DCFS reports by Robert Dennis were misleading and contained several inexplicable misrepresentations, as mother managed all three children well during visits, needed little prompting from monitors, and was well able to have the children returned to her for at least a 60-day visit, if not permanently. They testified visitation was cancelled at the DCFS Visitation Center not for the benefit of Options but because it severely

12

conflicted with mother's work and therapy schedule, and expanded visitation on a reasonable schedule had always been sought. Mother and the Options monitor disputed mother's limited intelligence diagnosis, denied that she was unable to recognize hazardous situations, denied that Options had a vested interest one way or another in this case, and complained that Dennis had reduced mother's visitation hours.

Michael C., who worked full time as a cook at The Magic Castle, testified he was engaged to mother and had no concerns at all about her parenting his daughter, Claire C., and mother's other two children.

DCFS reiterated the concerns expressed in its reports and denied they contained misrepresentations.

The court found mother had "come a significant way from when she first came into the courtroom." She "look[ed] a hundred percent better," was "more confident," and "carrie[d] herself in a whole different air." The court stated it was "not swayed by the department's argument about the mother being mildly retarded or [a] Regional Center client. . . . because that is not a basis for which we keep anyone's children from them, especially when they have so many hours with Regional Center and agencies such as Options." But the court was concerned about the amount of time that had gone by in the case, noting that Jacob M. had never lived with mother, and Iris V. had lived in foster care for four out of her five years. It troubled the court that mother had been unable "to reach anything more than monitored visits through the entire amount of time that the case had been" in dependency, even though she had been given "far more time than the law actually provides for her to have in order to have the children returned to her." Despite the fact that mother had "made leaps and bounds of progress," the court found it would not be in the children's best interests to change their arrangement. It therefore denied the petitions on April 7, 2014, and set the matter for a permanency hearing. Mother did not appeal that ruling.

At the contested permanency hearing, the minors' counsel acknowledged mother's progress but reluctantly recommended that parental rights be terminated, as Iris V. had lived with the foster mother most of her life and Jacob M. had lived with her all of his.

13

The trial court also acknowledged it had found in Claire C.'s case that mother was a capable parent of that child, but felt mother would be unable to parent all three children, especially given that Iris and Jacob had special needs. The court felt constrained by case law to terminate parental rights, which it did on August 20, 2014. This appeal followed.

## DISCUSSION

A.  *Termination of Parental Rights*

It is undisputed that mother lost custody of Iris V. and Jacob M. through no fault of her own, that she made belated but then heroic efforts and great progress as a parent during four years of reunification efforts, and that she maintained a progressively more consistent relationship with the children throughout. The only issue on appeal is whether substantial evidence supports the juvenile court's finding that her relationship with the children would not promote their wellbeing to such a degree as to outweigh the wellbeing they would gain by being adopted by the foster mother.

At a permanency hearing, the juvenile court must select and implement a plan for the dependent children with the goal of providing them stable, permanent homes. (§ 366.26, subd. (b); *In re K.P.* (2012) 203 Cal.App.4th 614, 620.) When a child has been removed from the custody of the parent and reunification services terminated, and "it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption" unless it finds termination of parental rights would be detrimental to the child under one of four specified circumstances. (§ 366.26, subd. (c)(1); *In re K.P.*, *supra*, 203 Cal.App.4th at p. 620; *In re Derek W.* (1999) 73 Cal.App.4th 823, 826.)

Iris V. and Jacob M. are adoptable, and the prospective adoptive parent is willing and well suited to take care of them on a permanent bases. The question is whether mother has shown termination of parental rights would be detrimental to the children because she maintained regular visitation and contact with them and they "would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

The "benefit" prong of the termination exception concerns whether "the relationship promotes the well-being of the child to such a degree as to outweigh the

14

well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) It requires a significant relationship that rises above incidental affection and care. "Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's need for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*Ibid*.)

Frequent, loving contact between a child and parent does not by itself establish the parent-child relationship required by the exception. (*In re Beatrice M*. (1994) 29 Cal.App.4th 1411, 1418-1419; see, e.g., *In re Cliffton B*. (2000) 81 Cal.App.4th 415, 424-425 ["'warm affectionate relationship'" between father and son, where son called father "daddy," did not outweigh potential benefit of adoption]; *In re Derek W*., *supra*, 73 Cal.App.4th at p. 827 ["emotional bond" and enjoyable visits between father and son insufficient when relationship bore "no resemblance to the sort of consistent, daily nurturing that marks a parental relationship"].) "[A] *parental* relationship is necessary for the exception to apply, not merely a friendly or familiar one." (*In re Jasmine D*. (2000) 78 Cal.App.4th 1339, 1350; see *In re Andrea R*. (1999) 75 Cal.App.4th 1093, 1108 ["parents must show that they occupy 'a parental role' in the child's life," not only "'frequent and loving contact,'" "an emotional bond with the child, or that the parents and child find their visits pleasant"].) "'[B]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.'" (*In re K.P*., *supra*, 203 Cal.App.4th 614, 621.)

Although mother transformed her parenting skills in the four years since Iris V. was detained, she did not establish she had a parental relationship with Iris or Jacob such that the parent-child relationship exception to termination would apply. It is undisputed

15

she maintained contact with the children, who enjoyed spending time with her, called her "Mommy," and were sad when they parted. They all engaged in generally happy interactions, eating together, playing, coloring and talking. Mother fed the children, corrected them, bathed and clothed them, and put them down for naps. But the children had other needs mother did not fill. Iris was diagnosed with Oppositional Defiant Disorder and had a speech impediment and required Wraparound Services. Jacob in the past suffered delays in his gross and motor skills and had required intensive services through the Regional Center. Although the evidence suggests mother was able to handle one or another child individually, substantial evidence, including the DCFS reports and testimony by a social worker, supported the juvenile court's finding that she was incapable of supervising all three children especially while also attending to Iris's special needs. The foster mother took care of these needs and saw to the children's education, while mother, in contrast, never progressed beyond monitored visitation, during which DCFS social workers observed she needed frequent prompting on caring for the children.

Unlike the case of *In re Amber M*. (2002) 103 Cal.App.4th 681, 690-691, on which mother relies, where the evidence supported a finding that a parental relationship existed between mother and the children based on their primary attachment with her, here, the children's primary attachment was with their foster parent, with whom Iris had resided for four of her five years and Jacob for all of his.

*In re S.B*. (2008) 164 Cal.App.4th 289, upon which mother also relies, is similarly distinguishable. There, a three-year-old child was removed from the custody of her father, who had always been her primary caregiver. (*Id*. at p. 298.) He had been diagnosed with combat-related posttraumatic stress disorder resulting from his service in a helicopter gunship during the Vietnam War, had a 30-year methamphetamine addiction, and suffered health problems that impeded his ability to care for the minor full time. When S.B. was removed, the father immediately acknowledged his drug problem and over the next 12 months fully complied with his case plan, remaining drug free and regularly visiting his daughter three days a week. (*Id*. at pp. 294-295, 298.) Even after the year apart, the minor continued to become upset when visits ended and wanted to

16

leave with her father. (*Id*. at p. 298.) The appellate court determined that despite lack of daily contact, the father continued his parental relationship with the child. (*Id*. at pp. 298-299.) Concluding that "the only reasonable inference" was that "S.B. would be greatly harmed by the loss of her significant, positive relationship with [her father]," the court found substantial evidence supported application of the parental benefit exception and therefore reversed the termination of parental rights. (*Id*. at p. 301.)

Here, in contrast, the juvenile court had substantial evidence before it that mother delayed complying with her case plan and, even after four years of services, enjoyed only a visitor or playmate relationship with Iris V. and Jacob M. and was incapable of parenting both children at once. Substantial evidence also indicated the foster mother had taken on the role of sole parent for most of Iris's life and all of Jacob's. The court was therefore well within its discretion to find the parental benefit exception did not apply, and to terminate parental rights.

B.      *Due Process*

Mother argues DCFS violated her substantive due process rights when Robert Dennis arbitrarily reduced her visitation time, excluded Options from the visits, refused to grant unmonitored visits or a 60-day trial visit, and made misrepresentations in his reports, all of which denied her the safeguards built into the dependency system to prevent the unlawful termination of her parental rights. In essence, mother argues that by refusing to liberalize visitation, DCFS effectively denied her any postreunification opportunity to establish a parental relationship with her children, then pointed to the lack of a parental relationship as justification for a finding that it would not be in their best interests to delay adoption.

DCFS preliminarily argues mother forfeited the argument by failing to petition for an extraordinary writ after the trial court denied her section 388 petition and ordered the matter set for a permanency hearing. We agree.

An order by the court setting a permanency hearing is not appealable unless "A petition for extraordinary writ review was filed in a timely manner." (§ 366.26, subd. (*l*)(1)(A).) "Failure to file a petition for extraordinary writ review . . . shall preclude

17

subsequent review by appeal of the findings and orders made pursuant to" section 366.26. (§ 366.26, subd. (*l*)(2); *In re Charmice G.* (1998) 66 Cal.App.4th 659, 668.)

At the section 366.26 permanency hearing, the only question before the juvenile court was whether mother had established a parental relationship with the minors. If she had not, the parental relationship exception to adoption could not be invoked nor adoption avoided. The court had no discretion to consider whether DCFS had prevented mother from forming a parental relationship because by then it would have been too late to do anything about it. (See *In re Charmice G.*, *supra*, 66 Cal.App.4th at p. 670 [juvenile court has no discretion at a section 366.26 hearing to consider evidence that return to parental custody is appropriate].) Any complaints about DCFS had to be raised by way of a section 388 petition, which would have permitted the court to decide in advance of the section 366.26 hearing whether mother was being given a fair chance to establish a parental relationship, and would have prevented "unnecessarily disrupting the focus and efforts of the court to establish permanency for the child." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.)

Mother's argument fails on its merits as well.

No state may deprive a person of life, liberty or property without due process of law. (*Adoption of Kay C.* (1991) 228 Cal.App.3d 741, 747.) A parent's interest in the custody and care of her children is basic civil right (*In re B.G.* (1974) 11 Cal.3d 679, 688), as is a child's interest in belonging to a family unit (*Adoption of Kay C.*, *supra*, 228 Cal.App.3d at p. 749). A child also has the right to be protected from abuse and neglect and to be placed in a stable, permanent, nurturing environment. (*In re David B.* (1979) 91 Cal.App.3d 184, 192-193, 195.) "The interests of the parent and the child, therefore, must be balanced." (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 306.)

"The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time. [Citations.] Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the

18

welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect." (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 307.) "California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful." (*Ibid.*) This interest "requires the court to concentrate its efforts, once reunification services have been terminated, on the child's placement and well-being, rather than on a parent's challenge to a custody order." (*Ibid.*)

"Significant safeguards have been built into the current dependency scheme. They include representation by counsel to assist parents at every stage of the proceedings (§ 317), notice of all hearings and rights (§§ 307.4, 308, 311, 316, 335-336, 364-366.23), clear and convincing evidence for removal from custody (§ 361, subd. (b)), reunification services (§ 361.5), and review hearings at which services and progress are reviewed (§§ 366.21, 366.22). [¶] The Legislature has recognized that a parent who has a child removed for neglect, abuse or substantial risk thereof, in most cases should be provided with services to assist the parent in overcoming the problems that led to removal. (§ 361.5.) It has also recognized that, in order to prevent children from spending their lives in the uncertainty of foster care, there must be a limitation on the length of time a child has to wait for a parent to become adequate. [Citations.] To avoid unnecessary delays in the process the Legislature has directed the juvenile court to 'give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements.' (§ 352, subd. (a).)" (*In re Marilyn H.*, *supra*, 5 Cal.4th at pp. 307-308.)

"Under the current dependency scheme, except in limited circumstances, a parent is entitled to 12 months of reunification services, with a possibility of 6 additional months, when a child is removed from a parent's custody. (§ 361.5.) The juvenile court must review the case at least once every six months. (§ 366.) At the dispositional hearing, and at each review hearing prior to permanency planning, there is a statutory presumption that the child will be returned to parental custody. At the dispositional hearing, the burden is on the state to prove, by clear and convincing evidence, that

19

removal of the child from the parent's custody is necessary. At 6-, 12-, and 18-month review hearings the juvenile court must return the child to the custody of the parent unless it determines, by a preponderance of the evidence, that return of the child would create a substantial risk of detriment to the child's physical or emotional well-being. (§§ 361, subd. (b), 366.21, subds. (e) & (f), 366.22, subd. (a).) At the review hearings the state must also present evidence that reasonable reunification services have been provided to the parent. (*Ibid*.) If the child may not safely be returned to the parents within a maximum of 18 months from removal, the court must develop a permanent plan for the child. Prior to terminating reunification services, the court must make a determination that it would be detrimental to the child to be returned to the parent's custody. (§§ 366.21, subd. (f), 366.22, subd. (a).) [¶] In between the normal review hearings the parent has the assistance of both a social worker and an attorney. In addition, throughout the reunification period and thereafter, the parent has the continuing right to petition the court for a modification of any of its orders based upon changed circumstances or new evidence pursuant to section 388." (*In re Marilyn H*., *supra*, 5 Cal.4th at pp. 308-309.)

"Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability. A hearing pursuant to section 366.26 to select and implement a permanent plan for the children is to be heard within 120 days from the time it was set. (§§ 361.5, subd. (f), 366.21, subds. (e) & (g), 366.22, subd. (a).) The court need not continue to consider the issue of reunification at the section 366.26 hearing. The burden thereafter is on the parent to prove changed circumstances pursuant to section 388 to revive the reunification issue. Section 388 provides [an] 'escape mechanism' . . . to allow the court to consider new information." (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 309.)

As mentioned above, mother was obligated to petition the juvenile court pursuant to section 388 to raise issues pertaining to any change in circumstances after the reunification period that may justify a change in any reunification order. She in fact did so, and the court heard testimony concerning her complaints and considered but

20

ultimately rejected her arguments. Our review of the court's rejection is for sufficiency of the evidence, where we presume in favor of the order and consider the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in support of the order. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

It is undisputed that all visitation authorized by DCFS fell within the letter of the juvenile court's orders. Mother contends Robert Dennis made misrepresentations on DCFS reports, misunderstood the actions of Options staff and mischaracterized their motives, mischaracterized mother's actions and progress, and made arbitrary decisions regarding visitation. DCFS contends mother's progress was insufficient and her parenting inadequate, Dennis's reports were accurate (or at worst, constituted "persuasive writing"), and Options staff was nonobjective.

All of this was (or could have been) before the juvenile court on mother's section 388 petition. The court weighed the evidence and arguments on both sides and found DCFS and Dennis to be credible and persuasive. We are in no position to reweigh the evidence to reach a contrary conclusion.

## DISPOSITION

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED.

CHANEY, J.

We concur:

ROTHSCHILD, P. J.          BENDIX, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.